DAVID C. SHONKA
Acting General Counsel

DARREN H. LUBETZKY
SAVVAS S. DIACOSAVVAS
KAREN DAHLBERG O'CONNELL
CHRISTOPHER Y. MILLER
(Each appearing per LR IA 11-3)
Federal Trade Commission
One Bowling Green, Suite 318
New York, NY 10004
Tel.: (212) 607-2808 (Lubetzky)
Email: dlubetzky@ftc.gov
Tel.: (212) 607-2809 (Diacosavvas)
Email: sdiacosavvas@ftc.gov
Tel.: (212) 607-2821 (Dahlberg O'Connell)
Email: koconnell@ftc.gov
Tel.: (212) 607-2811 (Miller)
Email: cmiller@ftc.gov
Fax: (212) 607-2822
ATTORNEYS FOR PLAINTIFF

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>INTERNET TEACHING AND TRAINING SPECIALISTS, LLC, also doing business as INTERNET TEACHING AND TRAINING and as ITT SPECIALISTS, a Nevada limited liability company,<br><br>VICTORIA A. HANSEN, individually and as an officer and owner of INTERNET TEACHING AND TRAINING SPECIALISTS, LLC,<br><br>DAVID R. COFFIN, JR., individually and as a | Case No.   **17-cv-3047**<br><br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

principal and de facto owner of INTERNET
TEACHING AND TRAINING SPECIALISTS,
LLC,

DEVAN W. LEONARD, also known as DEVIN
LEONARD, individually and as a principal and de
facto owner of INTERNET TEACHING AND
TRAINING SPECIALISTS, LLC,

          Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's trade regulation rule entitled Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), and 6105(b).

3.      Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by

2

1    statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a),

2    which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also

3    enforces the Telemarketing Act.  Pursuant to the Telemarketing Act, the FTC promulgated and

4    enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts

5    or practices.

6           5.       The FTC is authorized to initiate federal district court proceedings, by its own

7    attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief as

8    may be appropriate in each case, including rescission or reformation of contracts, restitution, the

9    refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b),

10   56(a)(2)(A), and 6105(b).

11                                          **DEFENDANTS**

12          6.       Defendant Internet Teaching and Training Specialists, LLC, also doing business

13   as Internet Teaching and Training and as ITT Specialists, ("ITT") is a Nevada limited liability

14   company with its principal place of business at 8778 South Maryland Parkway, #100 Las Vegas,

15   NV 89123 and with a business address at 848 N. Rainbow Blvd., #4133, Las Vegas, NV 89107.

16   ITT transacts or has transacted business in this district and throughout the United States.  At all

17   times material to this Complaint, acting alone or in concert with others, ITT has advertised,

18   marketed, distributed, or sold business development products and services to consumers

19   throughout the United States.

20          7.       Defendant Victoria A. Hansen ("Hansen") is president and an owner of ITT.  At

21   all times material to this Complaint, acting alone or in concert with others, she has formulated,

22   directed, controlled, had the authority to control, or participated in the acts and practices of ITT

3

including the acts and practice set forth in this Complaint. Defendant Hansen resides in Woods Cross, Utah and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

8. Defendant David R. Coffin, Jr. ("Coffin") is a de facto owner and principal of ITT. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of ITT including the acts and practices set forth in this Complaint. Defendant Coffin resides in Woods Cross, Utah and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

9. Defendant Devan W. Leonard, also known as Devin Leonard, ("Leonard" and, together with ITT, Hansen, and Coffin, the "Defendants") is a de facto owner and principal of ITT. At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of ITT including the acts and practices set forth in this Complaint. Defendant Leonard resides in Sandy, Utah and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

## COMMERCE

10. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

11. Since November 2014, ITT has sold purported personalized, one-on-one business

1  coaching and related products and services (the "Business Coaching Program") to consumers

2  trying to start a home-based Internet business.  ITT sells the Business Coaching Program through

3  telemarketing calls.

4      12.    ITT has sold the Business Coaching Program to thousands of consumers

5  nationwide and has generated over $10 million in revenue.  ITT typically charges consumers

6  several thousand dollars, and as much as $15,800, to enroll in the Business Coaching Program.

7      13.    ITT does not itself provide products or services to consumers.  Instead, when it

8  began doing business, it partnered with a company called Lift International, LLC, also doing

9  business as Guidance Interactive ("Guidance").  Under this arrangement, ITT sold the Business

10  Coaching Program that Guidance (and, thereafter, Guidance's successor entity, Learning

11  Systems, LLC) fulfilled.  ITT is one of several sales floors that sold the Business Coaching

12  Program fulfilled by Guidance.  The FTC sued Guidance and two other sales floors in June 2017

13  for engaging in deceptive telemarketing practices and entered into stipulated consent orders with

14  them. *See* Complaint, Final Consent Orders in *FTC v. Lift Int'l, LLC, et al.*, No. 17 Civ. 00506

15  (RJS) (D. Utah June 5, 2017).

16      14.    Most consumers who purchased the Business Coaching Program did not develop

17  a successful online business as ITT promised, earned little or no money, and ended up heavily in

18  debt.  Thousands of purchasers have lost millions of dollars as a result of ITT's deceptive

19  telemarketing scheme.

20              **ITT is a Collaboration Among Hansen, Coffin, and Leonard**

21      15.    ITT was formed in August 2014 as a Nevada limited liability company.  On

22  certain business documents, Hansen appears as the sole owner and officer of ITT.

5

16.     In truth and in fact, ITT is a collaboration among Hansen, Coffin, and Leonard. Like Hansen, Coffin and Leonard are de facto owners and principals of the business.

17.     Hansen, Coffin, and Leonard extracted over $1.7 million in proceeds from ITT in 2015 and 2016.  Approximately one-third of this money went to Leonard through an entity he controls called Desert Services, LLC, and approximately two-thirds went to Coffin and Hansen through an entity they jointly control called DCVH, LLC (which has their initials, DC and VH). Several payments were quarterly distributions paid to Coffin and Hansen through DCVH and to Leonard through Desert Services on the same day.

18.     Hansen, Coffin, and Leonard's relationship long predates ITT.

19.     Until October 2014, Leonard owned and operated a telemarketing sales floor called Paramount Concepts, LLC ("Paramount").  Coffin worked for Leonard at Paramount.

20.     On October 22, 2014, Paramount signed an Assurance of Voluntary Compliance settling an administrative investigation by the State of Utah Department of Commerce, Division of Consumer Protection ("Utah DCP") and admitted to violations of Utah's Business Opportunity Disclosure Act.  Paramount ceased operations that same day.  Leonard concurrently transitioned his Paramount business and business model to ITT, which began operating days later.

21.     Unlike Leonard and Coffin, Hansen was not listed as a principal or "key employee" of Paramount on telemarketing applications filed with the State of Utah.  Following Paramount's administrative settlement with the Utah DCP, Hansen was listed as the sole owner and manager of ITT on entity formation filings with the State of Nevada.

22.     Leonard transitioned his relationships with lead sources from Paramount to ITT (a "lead" is the contact information of a potential customer).  For example, as detailed below, ITT's two main lead sources were (i) a website doing business as Cash From Home and (ii) a lead broker called Motek Enterprises, Inc. and its successor entity, Red Steele LLC.  Both continued to supply leads without interruption as Leonard transitioned his Paramount business to ITT.

23.     Leonard also transitioned his relationship with Guidance from Paramount to ITT. Paramount had been selling the Business Coaching Program until it ceased operations on October 22, 2014.  That same day, ITT signed a Master Services Agreement with Guidance.  In this way, Defendants continued selling the Business Coaching Program without interruption.

24.     Leonard also transitioned employees from Paramount to ITT.  ITT's key managers, including its Operations Manager and Sales Manager, had been managers at Paramount.

25.     Even ITT's sales scripts, which guide ITT's sales representatives during telemarketing calls, are identical in content and wording to sales scripts used by Paramount.

26.     Hansen and Coffin are signatories on ITT's general operating bank account used by ITT to conduct business.  ITT used this account to pay for, among other things, leads and to receive deposits when purchasers pay for the Business Coaching Program by credit card.

27.     Hansen opened several merchant accounts used by ITT to conduct business.  A "merchant account" is a type of account that allows a business to receive payments from customers by credit card.  A merchant account is linked to a routine depository bank account. When a consumer makes a purchase and pays by credit card, that purchase transaction is

processed through the seller's merchant account, and then the sale proceeds are deposited into the seller's depository bank account.

28.     Credit card payment transactions can also be reversed.  Consumers have the ability to dispute charges that appear on their credit card bills by initiating what is known as a "chargeback" with their issuing bank.  The chargeback process is intended to protect consumers from improper and unauthorized charges to their credit cards.  When a chargeback occurs, the transaction at issue is reversed.  The reversal is processed through the seller's merchant account, and the money is debited from the seller's associated depository bank account and credited  back to the consumer's credit card account.

29.     ITT's merchant accounts are linked to its general operating bank account, and the account records for the general operating bank account show periodic chargeback debits.

30.     Hansen responded to inquiries by credit card processing entities and defended against chargebacks from dissatisfied customers.  While running Paramount, Leonard likewise defended against chargebacks from dissatisfied customers.  As an authorized contact on at least one of ITT's merchant accounts and a signatory on ITT's general operating bank account, Coffin could see ITT's chargeback and refund activity.

**ITT Engages Other Entities Selling Online Work-At-Home Programs to Solicit Customers**

31.     ITT solicits consumers through other entities that advertise and sell work-at-home programs over the Internet ("Online Offers").

32.     ITT buys customer leads from these Online Offers, both directly and indirectly through a broker known as Motek Enterprises, Inc. ("Motek") and its successor company, Red Steele, LLC ("Red Steele").

8

33.     ITT's representatives contact the consumers identified as leads by telephone to sell the Business Coaching Program.  In other instances, consumers are instructed by the Online Offer to call a telephone number and then are routed to ITT.

34.     The Online Offers typically claim that consumers who pay $97 or less to join a work-at-home program can make substantial income with little effort.

35.     For example, one of the Online Offers paid by ITT to supply leads is a website doing business as Cash From Home.  The Cash From Home website claims that consumers can earn significant income with little effort.  It states in one headline: "If You Can Spare 60 Minutes A Day, We Can Offer You A Certified, Proven And Guaranteed Home Job To Make Up To $379/Day From Home!"

36.     The Cash From Home website then describes an income opportunity in which the consumer would post links to a website advertising products and services on behalf of third-party merchants.  The Cash From Home website claims that consumers can earn $1,125 per week, or $58,500 per year, by spending just one hour a day posting links to websites.

37.     The Cash From Home website includes testimonials reinforcing these claims.  For example, one testimonial states: "I am now making $400 a day part-time. ... Within 1 month I was making over $300 a day and now 2 months later I am making an average of $450 a day .... Thanks for changing my life ...."

38.     The Cash From Home website claims that the Cash From Home program includes a "Free One-On-One Consultation With A [sic] Internet Wealth Expert!"

9

39.     Once consumers pay to join the Cash From Home program, they receive login credentials for the members-only area of the Cash From Home website and are instructed to call a telephone number for the "FREE One on One consultation with your start up specialist."

40.     Upon logging in, the members-only area of the Cash From Home website instructs consumers to "Call in to Talk to Your Startup Specialist!"  A popup window also immediately appears displaying a video of a man wearing a suit who, again, instructs consumers to call to speak with a "startup specialist," stating:  "A big part of your success is going to be instantly registering with one of our startup specialists.  All you have to do is call the toll free number below and get registered.  They'll help you get on the fast track to success right away."

41.     When consumers call this number, they are routed to telemarketing sales floors like ITT that, in turn, sell consumers business coaching and related services.

### ITT's Sales Practices Are Deceptive

42.     ITT's sales pitch typically lasts for more than an hour over the course of one or more telemarketing calls.

43.     In numerous instances, the initial call is designed to "probe" consumers' personal financial information and personal goals and hardships under the guise of a qualification screening process.

44.     Once consumers provide their personal information, they typically are then transferred to, or called later by, different sales representatives who try to "close" the sale. During the "close," the sales representatives typically tell consumers what the cost is to purchase the Business Coaching Program.  That cost varies greatly depending in part on the consumer's personal finances.

45.     ITT's sales representatives typically encourage the consumers to use their personal credit cards to pay for the program as part of a so-called "capital leverage" or "Other People's Money" strategy, specifically, to use "the bank's money" to start the business.  The sales representatives also appeal to consumers' expressed goals and hardships to pressure them into purchasing the Business Coaching Program.

46.     During these telemarketing calls, ITT makes a number of misrepresentations outlined below to generate sales.

**Misrepresentations About the Purpose of the Call, the Nature of the Program, and
The Need for Consumers' Personal Financial Information**

47.     In numerous instances, ITT sales representatives start their calls by claiming they are calling as part of the work-at-home product or service that the consumers previously purchased from the lead source and do not promptly and clearly identify themselves or disclose that the purpose of the calls is to sell another product or service.

48.     Later, ITT's representatives tell consumers that they are screening candidates for an exclusive program in which only qualifying participants get personalized assistance from expert coaches.

49.     In numerous instances, ITT's representatives tell consumers that the Business Coaching Program has limited spots, is not available to everyone, and/or that only qualified people can be accepted into the program.

50.     ITT's representations about the limited availability of the Business Coaching Program are false.

51.     In truth and in fact, there are no limits on how many sales of the Business Coaching Program ITT can make, and there are no qualification requirements to participate in the program other than the consumer's willingness to pay whatever ITT would charge.

52.     As part of the purported screening process, ITT's sales representatives ask consumers about their financial circumstances, including income, savings, debts, and credit card balances and limits.  ITT's telemarketing script instructs sales representatives to "GO CARD BY CARD" and obtain the balance and limit for each credit card without asking directly "how much available credit they have."

53.     ITT's representatives claim they need this information to assess the consumer's qualifications and/or to develop a business plan for the consumer to reach his or her goals.

54.     ITT's representations about the use of consumers' financial information are false.

55.     In truth and in fact, ITT does not use this information to assess a consumer's qualifications or develop a business plan.  Instead, in numerous instances, ITT uses this information to decide how much to charge consumers for the Business Coaching Program.  ITT charges consumers several thousand dollars, and as much as $15,800, to enroll in the Business Coaching Program.

**Misrepresentations About the Scope and Nature of Products and Services Provided**

56.     ITT's sales representatives typically distinguished the Business Coaching Program from the "self-taught system" consumers already had purchased from one of the Online Offers.

57.     In numerous instances, ITT's sales representatives tell consumers that if they purchase the Business Coaching Program, they will receive an ecommerce website, personalized guidance, and Internet marketing training from expert coaches.

58.     ITT's representations about the scope and nature of products and services provided are false.

59.     In numerous instances, purchasers do not receive a functioning ecommerce website.

60.     In numerous instances, purchasers do not receive personalized guidance or Internet marketing training from expert coaches.  Instead, in numerous instances, the training that consumers receive in the Business Coaching Program consists primarily of basic information available for free online, such as how to open an account on eBay or PayPal.

**Misrepresentations About Earnings**

61.     In numerous instances, ITT encourages consumers to purchase the Business Coaching Program by representing that consumers who purchase the program are likely to earn substantial income.

62.     ITT's earnings representations lead consumers to believe that they will be able to recoup the cost of their purchase and earn several thousand dollars a month from the Business Coaching Program.

63.     For example, ITT's sales representatives typically tell consumers that the testimonials and "success stories" they see online are previous participants who made money through the Business Coaching Program.  The Online Offers like Cash From Home that refer

customers to ITT present testimonials and success stories from purported consumers earning several thousand dollars a month.

64.     ITT's sales representatives typically ask consumers about their financial goals and how much they want to earn from their future business.  Regardless of the answer, ITT's representatives later typically tell consumers that for the Business Coaching Program to "work at the level you want" consumers should "commit 10 hours a week to achieve your goals."

65.     In numerous instances, ITT's representatives tell consumers that their stated financial goals of making several thousand dollars a month are attainable if they participate in the Business Coaching Program.

66.     ITT's earning claims are false.

67.     In truth and in fact, the overwhelming majority of consumers who purchase the Business Coaching Program do not earn substantial income.  In most instances, consumers who purchase the Business Coaching Program are never even able to establish an operating business.

**ITT Incurs Excessive Chargeback Levels**

68.     ITT has incurred excessive chargeback rates indicative of deceptive practices.

69.     In April and May 2015, two of ITT's merchant accounts were shut down by its credit card processors due to risk and chargeback concerns.  Around the same time, ITT opened several new merchant accounts through which it processed millions of dollars in consumer payments.

70.     From April 2015 through February 2017, ITT had a chargeback rate greater than 2% of its sales processed through two of its primary merchant accounts.  A chargeback rate greater than 1% is considered excessive by the credit card associations.

14

## VIOLATIONS OF THE FTC ACT

71.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

72.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

73.    As set forth below, Defendants have engaged in violations of Section 5(a) of the FTC Act in connection with the telemarketing and sale of the Business Coaching Program.

### Count One

### Misrepresentations Regarding Earnings
### (Against All Defendants)

74.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the Business Coaching Program, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who purchase and use the Business Coaching Program are likely to earn substantial income, such as several thousand dollars monthly.

75.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 74 of this Complaint, consumers who purchased the Business Coaching Program did not earn substantial income.

76.    Defendants' representations as set forth in Paragraph 74 of this Complaint are false or misleading or were not substantiated at the time the representations were made.

77.     Therefore, Defendants' representations as set forth in Paragraph 74 of this Complaint constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count Two

### Misrepresentation Regarding Products and Services Provided
### (Against All Defendants)

78.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the Business Coaching Program, Defendants have represented, directly or indirectly, expressly or by implication, that the Business Coaching Program:

        a.     is only open to a select number of qualified participants; and

        b.     includes development of an ecommerce website and personalized guidance and Internet marketing training from expert coaches.

79.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 78 of this Complaint:

        a.     there are no qualifications for entry into the program other than the consumer's willingness to pay whatever fees are charged; and

        b.     Defendants did not provide the products and services they represented they would provide, including but not limited to: an ecommerce website and personalized guidance and Internet marketing training from expert coaches.

80.     Therefore, Defendants' representations as set forth in Paragraph 78 of this Complaint are false and misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count Three

**Misrepresentation Regarding Need for Financial Information**
**(Against All Defendants)**

81.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the Business Coaching Program, Defendants have represented, directly or indirectly, expressly or by implication, that they need consumers' financial information to determine whether consumers are qualified for a program and/or to develop a business plan for consumers to reach their financial goals.

82.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 81 of this Complaint, Defendants do not use consumers' financial information to determine whether consumers are qualified for a program and/or to develop a business plan for consumers to reach their financial goals. Instead, the Defendants use consumers' financial information to decide how much to charge them for the Business Coaching Program.

83.     Therefore, Defendants' representations as set forth in Paragraph 81 of this Complaint are false and misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### VIOLATIONS OF THE TELEMARKETING SALES RULE

84.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, in 1994. The FTC adopted the original Telemarketing Sales Rule ("TSR") in 1995, extensively amended it in 2003, and amended certain sections thereafter.

85.    Defendants are "sellers" or "telemarketers" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

86.    Defendants' goods and services, including the Business Coaching Program, are "Investment Opportunit[ies]" as defined in the TSR, 16 C.F.R. § 310.2(s). The TSR defines an "Investment opportunity" as "anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation." 16 C.F.R. § 310.2(s).

87.    The TSR prohibits sellers and telemarketers from "[m]isrepresenting, directly or by implication, in the sale of goods and services . . . [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer." 16 C.F.R. § 310.3(a)(2)(iii).

88.    The TSR prohibits sellers and telemarketers from "[m]isrepresenting, directly or by implication, in the sale of goods and services . . . [a]ny material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability." 16 C.F.R. § 310.3(a)(2)(vi).

89.    The TSR prohibits sellers and telemarketers from "[m]aking a false or misleading statement to induce any person to pay for goods or services. . . ." 16 C.F.R. § 310.3(a)(4).

90.    The TSR requires telemarketers to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call: (1) the identity of the seller; (2) that the purpose of the call is to sell goods or services; and (3) the nature of the goods and services. 16 C.F.R. §§ 310.4(d)(1), (2) and (3).

18

91.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and
Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an
unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the
FTC Act, 15 U.S.C. § 45(a).

## Count Four

**Misrepresentations Regarding the Performance,
Efficacy, Nature or Central Characteristics of Goods and Services
(Against All Defendants)**

92.     In numerous instances, in connection with telemarketing offers to sell the
Business Coaching Program, Defendants have misrepresented, directly or indirectly, expressly or
by implication, material aspects of the performance, efficacy, nature, or central characteristics of
the Business Coaching Program, such as:

a.     consumers who purchase the Business Coaching Program are likely to
earn substantial income;

b.     the Business Coaching Program is only open to a select number of
qualified participants; and

c.     the Business Coaching Program includes development of an ecommerce
website and personalized guidance and Internet marketing training from expert
coaches.

93.     Defendants' acts or practices, as described in Paragraph 92 above, are deceptive
telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(iii) and (a)(4).

### Count Five

### Misrepresentations of Material Aspects of an
### Investment Opportunity in Connection with Telemarketing
### (Against All Defendants)

94.     In numerous instances, in connection with telemarketing offers to sell the

Business Coaching Program, Defendants have misrepresented, directly or indirectly, expressly or

by implication, material aspects of investment opportunities, including, but not limited to, the

risk, earnings potential, or profitability of the Business Coaching Program.

95.     Defendants' acts or practices, as described in Paragraph 94 above, are deceptive

telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(vi) and (a)(4).

### Count Six

### Failure to Disclose Identity, Purpose, Nature of Services
### (Against All Defendants)

96.     In numerous instances, in connection with telemarketing offers to sell the

Business Coaching Program, Defendants, directly or indirectly, have failed to disclose promptly

and in a clear and conspicuous manner to the person receiving the call: (a) the identity of the

seller; (b) that the purpose of the call is to sell services; and (c) the nature of those services.

97.     Therefore, the Defendants' acts or practices, as described in Paragraph 96 above,

are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(d)(1), (2), and

(3).

### CONSUMER INJURY

98.     Consumers have suffered and will continue to suffer substantial injury as a result

of Defendants' violations of the FTC Act and the TSR.  In addition, Defendants have been

1  unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this

2  Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm

3  the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

5  99.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant

6  injunctive and such other relief as the Court may deem appropriate to halt and redress violations

7  of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable

8  jurisdiction, may award ancillary relief, including rescission or reformation of contracts,

9  restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and

10  remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

12  Wherefore, Plaintiff FTC, pursuant to Sections 13(b) of the FTC Act, 15 U.S.C. § 53(b),

13  Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable

14  powers, requests that the Court:

15  A.  Enter a permanent injunction to prevent future violations of the FTC Act and the

16  TSR by Defendants;

17  B.  Award such relief as the Court finds necessary to redress injury to consumers

18  resulting from Defendants' violations of the FTC Act and the TSR, including, but not limited to,

19  rescission or reformation of contracts, restitution, the refund of monies paid, and the

20  disgorgement of ill-gotten monies; and

21  C.  Award Plaintiff the costs of bringing this action, as well as such other and

22  additional relief as the Court may determine to be just and proper.

1

2

3

4   Dated: 12/12/2017

5

6

7

8

9

10

11

12

13

Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

Darren H. Lubetzky
Savvas S. Diacosavvas
Karen Dahlberg O'Connell
Christopher Y. Miller
Federal Trade Commission
Northeast Region
One Bowling Green, Suite 318
New York, NY 10004
Tel.: (212) 607-2829
Fax: (212) 607-2822
Email: dlubetzky@ftc.gov
Email: sdiacosavvas@ftc.gov
Email: koconnell@ftc.gov
Email: cmiller@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION